**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| _____ ) | |
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **ENBRIDGE ENERGY, LIMITED** ) | |
| **PARTNERSHIP,** ) | |
| **ENBRIDGE PIPELINES (LAKEHEAD) L.L.C.,** ) | **Civil Action No.** 1:16-cv-914 |
| **ENBRIDGE ENERGY PARTNERS, L.P.,** ) | |
| **ENBRIDGE ENERGY MANAGEMENT, L.L.C.,** ) | **Judge** |
| **ENBRIDGE ENERGY COMPANY, INC.,** ) | |
| **ENBRIDGE EMPLOYEE SERVICES, INC.,** ) | |
| **ENBRIDGE OPERATIONAL SERVICES, INC.,** ) | |
| **ENBRIDGE PIPELINES INC., and** ) | |
| **ENBRIDGE EMPLOYEE SERVICES** ) | |
| **CANADA INC.,** ) | |
| ) | |
| **Defendants.** ) | |
| _____ ) | |

# COMPLAINT

Plaintiff, the United States of America, by the authority of the Attorney General of the

United States and through the undersigned attorneys, acting at the request of the Administrator of

the United States Environmental Protection Agency ("EPA") and the United States Coast Guard,

files this Complaint and alleges as follows:

## NATURE OF THE ACTION

1.      This is a civil action arising from unlawful discharges of oil into waters of the United States from two separate oil transmission pipelines, known as Line 6A and Line 6B, both of which are owned or operated by Defendants.  In this action, the United States seeks injunctive relief pursuant to Section 309 of the Clean Water Act, as amended ("CWA"), 33 U.S.C. § 1319, to assure compliance by Defendants with the CWA and to require Defendants to take appropriate steps to prevent future unpermitted discharges of pollutants from their pipelines to waters of the United States.  In addition, pursuant to Section 311(b)(7) of the CWA, 33 U.S.C. § 1321(b)(7), the United States seeks assessment of civil penalties against Defendants for discharging oil into or upon navigable waters of the United States or adjoining shorelines in violation of Section 311(b)(3) of the CWA, 33 U.S.C. § 1321(b)(3).  Finally, pursuant to Sections 1002 and 1017(f)(2) of the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. §§ 2702 and 2717(f)(2), and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 - 2202, the United States seeks a judgment against Defendants for unreimbursed removal costs incurred by the United States in connection with the discharges from Line 6B, as well as a declaration that the Defendants are responsible and strictly liable under Sections 1002 and 1004 of OPA, 33 U.S.C. §§ 2702 and 2704, for all removal costs resulting from such discharges, without any monetary limitation on such costs and damages.

2.      The Defendants named in this action are Enbridge Energy, Limited Partnership; Enbridge Pipelines (Lakehead) L.L.C.; Enbridge Energy Partners, L.P.; Enbridge Energy Management, L.L.C.; Enbridge Energy Company, Inc.; Enbridge Employee Services, Inc.; Enbridge Operational Services, Inc.; Enbridge Pipelines Inc.; and Enbridge Employee Services Canada Inc. ("Defendants").

2

## JURISDICTION, AUTHORITY, AND VENUE

3.      This Court has jurisdiction over the United States' claims pursuant to Sections 309(b), 311(b)(7)(E) and (n) of the CWA, 33 U.S.C. §§ 1319(b) and 1321(b)(7)(E) and (n), Section 1017(b) of OPA, 33 U.S.C. § 2717(b), and 28 U.S.C. §§ 1331, 1345, and 1355.

4.      Authority to bring the United States' claims is vested in the United States Department of Justice by, *inter alia*, Section 506 of the CWA, 33 U.S.C. § 1366, and 28 U.S.C. §§ 516 and 519.

5.      Venue is proper in the Western District of Michigan under Sections 309(b) and 311(b)(7)(E) of the CWA, 33 U.S.C. §§1319(b) and 1321(b)(7)(E), Section 1017(b) of OPA, 33 U.S.C. § 2717(b), and 28 U.S.C. §§ 1391 and 1395 because the Defendants reside, are located or are doing business in this district.

## DEFENDANTS

6.      Defendant Enbridge Energy, Limited Partnership ("EELP"), which was formerly known as "Lakehead Pipe Line Company, Limited Partnership," is a limited partnership organized in the State of Delaware and registered to do business in the State of Michigan, with its principal office at 1100 Louisiana Street, Suite 3300, Houston, TX 77002.  At all times relevant to this action, EELP owned and/or operated Line 6A and Line 6B in conjunction with other Enbridge entities herein named as Defendants.

7.      Enbridge Pipelines (Lakehead) L.L.C. ("EP-Lakehead") is a limited liability company organized in the State of Delaware and registered to do business in the State of Michigan, with its principal office at 1100 Louisiana Street, Suite 3300, Houston, TX 77002.  At

all times relevant to this action, EP-Lakehead was the managing general partner of EELP and, as such, it owned and/or operated Line 6A and Line 6B in conjunction with other Enbridge entities herein named as Defendants.

8. Enbridge Energy Partners, L.P. ("EEP") is a limited partnership organized in the State of Delaware and is believed to do business in the State of Michigan with its principal office at 1100 Louisiana Street, Suite 3300, Houston, TX 77002. At all times relevant to this action, EEP owned and/or operated Line 6A and Line 6B in conjunction with other Enbridge entities herein named as Defendants.

9. Enbridge Energy Management, L.L.C. ("EEM") is a limited liability company organized in the State of Delaware and is believed to do business in the State of Michigan, with its principal office at 1100 Louisiana Street, Suite 3300, Houston, TX 77002. At all times relevant to this action, EEM owned and/or operated Line 6A and Line 6B in conjunction with other Enbridge entities herein named as Defendants.

10. Enbridge Energy Company, Inc. ("EECI"), which was formerly known as "Lakehead Pipe Line Company, Inc.," is incorporated in the State of Delaware and registered to do business in the State of Michigan, with its principal office at 1100 Louisiana Street, Suite 3300, Houston, TX 77002. At all times relevant to this action, EECI owned and/or operated Line 6A and Line 6B in conjunction with other Enbridge entities herein named as Defendants.

11. Enbridge Employee Services, Inc. ("EESI") is incorporated in the State of Delaware and registered to do business in the State of Michigan with its principal office at 1100 Louisiana Street, Suite 3300, Houston, TX 77002. At all times relevant to this action, EESI owned and/or operated Line 6A and Line 6B in conjunction with other Enbridge entities herein named as Defendants.

4

12.     Enbridge Operational Services, Inc. ("EOSI") is a Canadian corporation that is believed to do business in the State of Michigan with its principal office at 10201 Jasper Avenue N.W., Edmonton, Alberta, Canada T5J 3N7.  At all times relevant to this action, EOSI owned and/or operated Line 6A and Line 6B in conjunction with other Enbridge affiliates herein named as Defendants.

13.     Enbridge Pipelines Inc. ("EPI"), which was formerly known as "Interprovincial Pipe Line Limited," is a Canadian corporation and is believed to do business in the State of Illinois and the State of Michigan, with its principal office at 3000 Fifth Avenue Place, 425 1st Street S.W., Calgary, Alberta, Canada T2P 3L8.  At all times relevant to this action, EPI owned and/or operated Line 6A and Line 6B in conjunction with other Enbridge affiliates herein named as Defendants.  In 2015, EPI transferred to Enbridge Employee Services Canada Inc. property that was owned by EPI in 2010.

14.     Enbridge Employee Services Canada Inc. ("EESCI") is a Canadian corporation that is believed to do business in the State of Michigan, with its principal office at 3000 Fifth Avenue Place, 425 1st Street S.W., Calgary, Alberta, Canada T2P 3L8.  As a result of the transaction in which EPI transferred property to EESCI in 2015, EESCI succeeded to certain liabilities of EPI, including liabilities arising from the 2010 oil discharges from Line 6A and Line 6B described below in this Complaint.

15.     Each of the defendants identified in Paragraphs 6 - 14, above, (collectively referred to herein as "Defendants" or "Enbridge") is a "person" within the meaning of Sections 311(a)(7) and 502(5) of the CWA, 33 U.S.C. §§ 1321(a)(7) and 1362(5), and within the meaning of Section 1001(27) of OPA, 33 U.S.C. § 2701(27).

## GENERAL ALLEGATIONS

### Enbridge Pipeline Systems

16.     Defendants own or operate an extensive network of liquid transportation pipelines in the United States and Canada.  Most of these liquid transportation pipelines are organized into a number of different pipeline systems, including the Mainline System which includes more than 3,000 miles of pipeline in the United States and Canada.

17.     Originating near the oil fields of Western Canada, the Mainline System transports crude oil and other liquid petroleum products from Edmonton, Canada to major refining centers in the Great Lakes and Midwest regions of the United States and the province of Ontario, Canada. In 2010, the Mainline System delivered approximately 65% of the Canadian crude oil that moved into the United States.

18.     The United States portion of the Mainline System, which is known as the Lakehead System, begins at the Canadian-United States border near Neche, North Dakota, and spans approximately 1,900 miles across six states before it returns to Canada near Marysville, Michigan.  The Lakehead System is comprised of numerous different liquid pipelines, including lines known as Line 2, Line 3, Line 4, Line 5, Line 6A, Line 6B and Line 14.  Portions of each of these lines either cross, or are located in close proximity to waters of the United States.  At various times, each of the lines listed above has had certain pipeline integrity problems, and each of the listed lines has had one or more failures that resulted in the release of oil as a result of such integrity problems.  At various times, pipeline failures on each of the listed lines resulted in discharges of oil to surface waters.

## Discharges of Oil from Line 6B

19.    One of the Lakehead System pipelines, known as Line 6B, is a 293-mile long pipeline that runs between Griffith, Indiana, and Sarnia, Ontario, Canada.

20.    During the course of a regularly scheduled shutdown on Line 6B on July 25, 2010, Line 6B ruptured, discharging oil into the environment.  Although the control room terminal used to operate Line 6B received several different alarms and other indicia of a potential pipeline rupture at or around the time of the Line 6B shutdown on July 25, 2010, Enbridge did not recognize that Line 6B had ruptured until more than 17 hours later.  On two separate occasions on July 26, 2010, Enbridge restarted Line 6B, injecting additional oil into the section of the pipeline that had ruptured, and discharging additional oil into the environment.  As a result of the initial rupture of Line 6B on July 25, 2010 and each of the two restarts of Line 6B, Enbridge discharged at least 20,082 barrels of oil into the environment from Line 6B.

21.    On July 2, 2012, after completing an investigation of the Line 6B pipeline rupture and resulting discharges, the Pipeline and Hazardous Materials Safety Administration ("PHMSA") initiated an administrative enforcement action against EELP by issuing a Notice of Probable Violation ("NOPV") in CPF No. 32012-5013.  The NOPV proposed to assess civil penalties for alleged violations of various regulations promulgated under federal pipeline safety laws codified at 49 U.S.C. §§ 60101 - 60140, including 49 C.F.R. § 195.452(h)(4), 49 C.F.R. § 195.452(j)(2), 49 C.F.R. § 195.401, and 49 C.F.R. § 195.402(a).

22.    On September 7, 2012, PHMSA issued a Final Order in CPF No. 3-2012-5013 ("Final Order").  The Final Order found that EELP had committed each of the violations identified in the NOPV, including the violations referred to in Paragraph 21, above.

7

23.     The violations described in Paragraph 21, above, were a proximate cause of some or all of the discharges of oil from Line 6B on July 25 and July 26, 2010.

24.     The Line 6B discharges described above included at least two types of oil - Cold Lake Blend and Western Canadian Select - both of which combine heavy crude derived from Canadian "tar sands" with a hydrocarbon diluent.

25.     The July 25, 2010 rupture of Line 6B was located in an undeveloped agricultural area south of the City of Marshall near the intersection of MI-227 (old US-27) and Division Drive.

26.      After initially pooling in a marshy area about 700 feet north of Talmadge Creek, oil discharged from Line 6B on July 25 and July 26, 2010 and flowed southward to Talmadge Creek, which carried the discharged oil into the Kalamazoo River.  Oil contamination then moved downstream in the Kalamazoo River at least as far as Morrow Lake, 38 miles downstream from the point where Talmadge Creek enters the Kalamazoo River.

27.     At atmospheric pressure, some of the volatile constituents in the discharged oil moved from a liquid to a vapor state, affecting air quality in the vicinity of the discharges.  Such vaporized constituents included benzene, a hazardous air pollutant that can have significant short-term and long-term health effects.  Within hours of the pipeline rupture, the local 911 dispatch center began to receive calls from citizens reporting a strong odor.

28.     First Responders from fire departments in Marshall City and Marshall Township investigated the calls.  Although they could also detect odors, they were unable to find the source of the odors in the dark.

29.     At the time of the Line 6B discharges on July 25 and July 26, 2010, Talmadge Creek and the Kalamazoo River were in flood stage and outside their banks due to heavy rainfall

8

during the previous days.  As a result, crude oil covered both water bodies from bank to bank and entered into and affected their associated floodplains on both sides of the waterways.

30.     As a result of the Line 6B discharges on July 25 and July 26, 2010, a 34-mile section of the Kalamazoo River remained closed to public use for approximately two years after the discharges.

31.     Oil discharged from Line 6B on July 25 and July 26, 2010 resulted in the injury and death of flora, fauna and other wildlife near, and within, the impacted waterways and floodplains, and impacted groundwater, surface water and sediment.

32.     Oil discharged from Line 6B on July 25 and July 26, 2010 harmed, and threatened to harm, first responders and members of the public who were exposed to the oil and its noxious fumes.

33.     Oil discharged from Line 6B on July 25 and July 26, 2010 caused economic loss to members of the public.  The discharges have caused the United States to incur millions of dollars in removal costs to date, and the United States will continue to incur some additional removal costs as a result of the discharges.

### Oil Discharges from Line 6A

34.     Another Lakehead System pipeline, known as Line 6A, transports crude oil from Canada into the United States.  In the United States, Line 6A runs approximately 467 miles from the Canadian border near Neche, North Dakota to a terminal in Superior, Wisconsin, before continuing to another terminal in Griffith, Indiana.

35.     On or about September 9, 2010, Line 6A discharged Smiley Coleville crude oil into the environment from a 2.25 inch hole in the pipeline in Romeoville, Illinois.  At least 6,427 barrels of oil discharged from Line 6A.  Much of the discharged oil entered a storm sewer, which

9

flowed into an unnamed tributary of the Des Plains River and a two-acre retention pond located approximately one-half mile upstream from the Des Plaines River. Discharged oil impacted approximately 1,400 feet of the unnamed tributary and its shorelines, as well as the retention pond and its shorelines. Discharged oil also impacted a portion of the Romeoville sanitary sewer system and public wastewater treatment plant.

36.     Pursuant to an administrative order issued by U.S. EPA, Region 5, in *In the Matter of Enbridge Energy, Limited Partnership* (Docket No. 1321-5-10-003), EELP conducted specified removal actions, including soil, water and sediment sampling, air monitoring, and cleanup and disposal of discharged oil and oil contaminated wastes. EELP completed the activities required by the administrative order and submitted a final report describing the work it performed by December 9, 2010.

37.     The United States incurred more than $ 615,000 in connection with removal actions relating to the oil discharged from Line 6A. Enbridge has reimbursed all of those removal costs.

## STATUTORY FRAMEWORK FOR FEDERAL CLAIMS

### Clean Water Act Section 311 - Unlawful Discharges of Oil or Hazardous Substances

38.     Section 311(b)(3) of the CWA prohibits the "discharge of oil or hazardous substances (i) into or upon the navigable waters of the United States [and] adjoining shorelines, . . . or which may affect natural resources belonging to [or] appertaining to the United States . . . , in such quantities as may be harmful as determined by the President under paragraph (4) of . . . subsection [311(b) of the CWA]."

10

39.    Section 311(b)(4) of the CWA authorizes the President to determine the quantities of oil and hazardous substances the discharge of which "may be harmful to the public health or welfare or the environment of the United States, including but not limited to fish, shellfish, wildlife, and public and private property, shorelines and beaches."  33 U.S.C. § 1321(b)(4).

40.    For purposes of Section 311 of the CWA, 33 U.S.C. § 1321, "oil" is defined to include "oil of any kind or in any form, including, but not limited to, petroleum, fuel oil, sludge, oil refuse, and oil mixed with wastes other than dredged spoil."

41.    For purposes of Section 311 of the CWA, 33 U.S.C. § 1321, "discharge" is defined to include:

> any spilling, leaking, pumping, pouring, emitting, emptying or dumping, but excludes (A) discharges in compliance with a permit under section 1342 of this title, (B) discharges resulting from circumstances identified and reviewed and made a part of a public record with respect to a permit issued or modified under section 1342 of this title, and subject to a condition in such permit,, [sic] (C) continuous or anticipated intermittent discharges from a point source, identified in a permit or permit application under section 1342 of this title, which are caused by events occurring within the scope of relevant operating or treatment systems, and (D) discharges incidental to mechanical removal authorized by the President under subsection (c) of this section.

42.    "Navigable waters" is defined for purposes of both Sections 301 and 311 of the CWA, 33 U.S.C. §§ 1311 and 1321, as "waters of the United States, including the territorial seas."  Section 502(7) of the CWA, 33 U.S.C. § 1362(7).

43.    The President's authority under Section 311(b)(4) of the CWA, 33 U.S.C. § 1321(b)(4) has been delegated to U.S. EPA.  Pursuant to its authority under the CWA, EPA has promulgated regulations that define quantities of oil that "may be harmful" to include quantities sufficient to "[c]ause a film or sheen upon or discoloration of the surface of the water or adjoining

shorelines or cause a sludge or emulsion to be deposited beneath the surface of the water or upon adjoining shorelines." 40 C.F.R. § 110.3.

44.     Section 311(b)(7)(A) of the CWA provides that "[a]ny person who is the owner, operator, or person in charge of any . . . onshore facility . . . from which oil . . . is discharged in violation of paragraph (3) [of Section 311(b)], shall be subject to a civil penalty." 33 U.S.C. § 1321(b)(7)(A).

45.     For purposes of Section 311 of the CWA, 33 U.S.C. § 1321, "onshore facility" refers to "any facility . . . of any kind located in, on, or under, any land within the United States other than submerged land." 33 U.S.C. § 1321(a)(10).

46.     Under Section 311(b)(7) of the CWA, 33 U.S.C. § 1321(b)(7), owners and operators of a facility from which oil discharged in violation of Section 311(b)(3) of the CWA, 33 U.S.C. § 1321(b)(3), are subject to civil penalties.  During the time period applicable to the 2010 discharges described in this Complaint, Section 311(b)(7)(D) of the CWA, 33 U.S.C. § 1321(b)(7)(D), together with the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461, and 40 C.F.R. § 19.4, provides for civil penalties of not less than $140,000 and not more than $4,300 per barrel discharged, in cases where a violation of Section 311(b)(3) of the CWA, 33 U.S.C. § 1321(b)(3), was a result of gross negligence or willful misconduct, and civil penalties of up to $37,500 per day of violation or an amount up to $1,100 per barrel discharged, in other cases.

47.     Pursuant to Section 311(s) of the CWA, 33 U.S.C. § 1321(s), amounts received by the United States for actions under Section 311 shall be deposited in the "Oil Spill Liability Trust Fund" established under 26 U.S.C. § 9509 to, *inter alia*, fund cleanups of future discharges and substantial threats of discharges of oil.

12

**Section 301 of the Clean Water Act -**
**Unlawful Discharges of Pollutants Without a Permit**

48.     Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the "discharge of any pollutant by any person," except, *inter alia*, in compliance with a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, by EPA or an authorized state.

49.     Section 502(12) of the CWA defines the term "discharge of a pollutant" as "any addition of any pollutant to navigable waters from any point source."  33 U.S.C. § 1362(12).

50.     The definition of "pollutant" in Section 502(6) of the CWA encompasses oil. 33U.S.C. § 1362(6).

51.     Section 502(14) of the CWA defines "point source" as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged."  33 U.S.C. § 1362(14).

52.     Section 309(b) of the CWA, 33 U.S.C. § 1319(b), authorizes civil actions for "appropriate relief, including a permanent or temporary injunction" in the case of violation of specified provisions of the CWA, including violations of Section 301 of the CWA, 33 U.S.C. § 1311, and grants jurisdiction to district courts to restrain such violations and to require compliance.

**Section 1002 of the Oil Pollution Act**
**Liability for Removal Costs**

53.     The principal purposes of the OPA include establishing a fund to pay for the costs of removal of oil in the event of a discharge or a substantial threat of a discharge of oil, and to compensate any party suffering damages from actual or threatened discharges of oil.  S. Rep. No.

101-94 (1989), *reprinted in* 1990 U.S.C.C.A.N. 722.  Congress designed OPA to provide

protection for the environment and to aid the victims of oil spills.  *Id.*

     54.    Section 1002(a) of OPA, 33 U.S.C. § 2702(a), provides:

> Notwithstanding any other provision or rule of law . . . each responsible party for a
> vessel or a facility from which oil is discharged, or which poses the substantial
> threat of a discharge of oil, into or upon the navigable waters or adjoining
> shorelines or the exclusive economic zone is liable for the removal costs and
> damages specified in subsection (b) of this section that result from such incident.

     55.    For purposes of OPA, "facility" is defined in Section 1001(9) of OPA, 33 U.S.C.

§ 2701(9), as:

> any structure, group of structures, equipment, or device (other than a vessel) which
> is used for one or more of the following purposes:  exploring for, drilling for,
> producing, storing, handling, transferring, processing, or transporting oil.  This term
> includes any motor vehicle, rolling stock, or pipeline used for one or more of these
> purposes.

     56.    For purposes of OPA, "oil" is defined in Section 1001(23) of OPA, 33 U.S.C.

§ 2701(23), to include:

> oil of any kind or in any form, including petroleum, fuel oil, sludge, oil refuse, and
> oil mixed with wastes other than dredged spoil, but does not include any substance
> which is specifically listed or designated as a hazardous substance under
> subparagraphs (A) through (F) of section 101(14) of the Comprehensive
> Environmental Response, Compensation, and Liability Act (42 U.S.C. •§ 9601) and
> which is subject to the provisions of that Act . . .

     57.    For purposes of OPA, "discharge" is defined in Section 1001(7) of OPA, 33

U.S.C. § 2701(7), as "any emission (other than natural seepage), intentional or unintentional, and

includes, but is not limited to, spilling, leaking, pumping, pouring, emitting, emptying, or

dumping."

     58.    For purposes of OPA, "navigable waters" is defined in Section 1001(21), 33

U.S.C. § 2701(21), as "the waters of the United States, including the territorial sea."

59.     In the case of a pipeline facility, "responsible party" is defined in Section 1001(32)(E) of OPA, 33 U.S.C. § 2701(32)(E), as "any person owning or operating the pipeline."

60.     Section 1002(b)(1)(A) of OPA, 33 U.S.C. § 2702(b)(1)(A), provides that the removal costs for which responsible parties are liable under OPA include "all removal costs incurred by the United States, a State, or an Indian tribe under subsection (c) . . . of section 1321 of this title."

61.     Federal oil spill removal actions may be financed through the Oil Spill Liability Trust Fund ("Spill Fund").  *See* 26 U.S.C. §§ 4611 and 9509.  Pursuant to OPA Section 1012(a), 33 U.S.C. § 2712(a), the Spill Fund can be used, *inter alia,* for the payment of federal and state removal costs; certain claims against the Spill Fund related to uncompensated removal costs; and certain federal administrative, operational and personnel costs and expenses under OPA.  The Spill Fund is administered by the U.S. Coast Guard National Pollution Funds Center.

62.     For purposes of OPA, the terms "remove" and "removal" are defined in Section 1001(30) of OPA, 33 U.S.C. § 2701(30), as "containment and removal of oil or a hazardous substance from water and shorelines or the taking of other actions as may be necessary to minimize or mitigate damage to the public health or welfare, including, but not limited to, fish, shellfish, wildlife, and public and private property, shorelines, and beaches."

63.     "Removal costs" are defined in Section 1001(31) of OPA, 33 U.S.C. § 2701(31), to include "the costs of removal that are incurred after a discharge of oil has occurred."

## CAUSES OF ACTION

### Claim No. 1:   Civil Penalties for
### Violation of Section 311 of the Clean Water Act

64.     Paragraphs 1 through 63 are re-alleged and incorporated herein by reference.

65.     Line 6B is an "onshore facility" within the meaning of Section 311(a)(10) of the CWA, 33 U.S.C. §1321(a)(10).

66.     Line 6A is an "onshore facility" within the meaning of Section 311(a)(10) of the CWA, 33 U.S.C. §1321(a)(10).

67.     Talmadge Creek, the Kalamazoo River, Morrow Lake, and their adjacent wetlands are also navigable waters of the United States within the meaning of Sections 311(b)(3) and 502(7) of the CWA, 33 U.S.C. § 1321(b)(3) and 1362(7).

68.     The unnamed tributary to the Des Plaines River and the retention ponds referred to in Paragraph 35, above, are navigable waters of the United States within the meaning of Sections 311(b)(3) and 502(7) of the CWA, 33 U.S.C. § 1321(b)(3) and 1362(7).

69.     The spilling of oil from Line 6B as a result of the pipeline rupture on July 25, 2010, constituted a discharge of oil within the meaning of Section 311(a)(2) and (b)(3) of the CWA, 33 U.S.C. § 1321(a)(2) and (b)(3).  The spilling of oil from Line 6B during each instance in which Enbridge restarted Line 6B and pumped additional oil to the ruptured pipeline section on July 26, 2010 constituted a discharge of oil within the meaning of Section 311(a)(2) and (b)(3) of the CWA, 33 U.S.C. § 1321(a)(2) and (b)(3).

70.     The spilling of oil from Line 6A on or about September 9, 2010 also constituted a discharge of oil within the meaning of Section 311(a)(2) and (b)(3) of the CWA, 33 U.S.C. § 1321(a)(2) and (b)(3).

71.     None of the Defendants ever applied for or obtained any permit that authorized or established conditions with respect to any of the discharges referred to in Paragraphs 69 and 70. None of those discharges was incidental to a removal action authorized pursuant to Section 311(c) of the CWA, 33 U.S.C. § 1321(c).

72.     Each of the discharges of oil referred to in the Paragraphs 69 and 70 was in a quantity as may be harmful, within the meaning of Section 311(b)(3) of the CWA, 33 U.S.C. § 1321(b)(3) and 40 C.F.R. § 110.3.  Each of the Line 6B discharges referred to above resulted in the presence of oil in Talmadge Creek, the Kalamazoo River, Morrow Lake, adjacent wetlands, and/or adjoining shorelines in sufficient quantities to cause a sheen, sludge, emulsion or violation of water quality standards.  The Line 6A discharges referred to above resulted in the presence of oil in the unnamed tributary and retention pond referred to in Paragraph 35 above in sufficient quantities to cause a sheen, sludge, emulsion or violation of water quality standards.

73.     Each of the discharges referred to in Paragraphs 69 and 70 violated Section 311(b)(3) of the CWA, 33 U.S.C. § 1321(b)(3).

74.     Each Defendant is an owner or operator of Line 6A and Line 6B within the meaning of Section 311(a)(6) of the CWA, 33 U.S.C. § 1321(a)(6).

75.     Pursuant to Section 311(b)(7) of the CWA, 33 U.S.C. § 1321(b)(7), the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461, and 40 C.F.R. § 19.4, each Defendant is liable for a civil penalty of up to $4,300 per barrel discharged from Line 6B and a civil penalty of up to $1,100 per barrel discharged from Line 6A.

### Claim No. 2:   Injunctive Relief
### Under Sections 301 and 309 of the Clean Water Act

76.     Paragraphs 1 through 75 are re-alleged and incorporated herein by reference.

77.     Line 6B was a "point source" within the meaning of Section 502(14) of the CWA, 33 U.S.C. § 1362(14), and Line 6A was a "point source" within the meaning of Section 502(14) of the CWA, 33 U.S.C. § 1362(14).

78.     The oil spilled from both Line 6A and Line 6B is a "pollutant" within the meaning of Sections 301(a) and 502(6) of the CWA, 33 U.S.C. §§ 1311(a) and 1362(6).

79.     Each instance in which oil spilled from the ruptured Line 6B entered Talmadge Creek, the Kalamazoo River, Morrow Lake or adjacent wetlands on July 25 and July 26, 2010, was a "discharge of pollutants" within the meaning of Sections 301(a) and 502(12) of the CWA, 33 U.S.C. §§ 1311(a) and 1362(12).   Each instance in which oil spilled from Line 6A entered the unnamed tributary of the Des Plaines River and the retention pond referred to in Paragraph 35 above was a "discharge of pollutants" within the meaning of Sections 301(a) and 502(12) of the CWA, 33 U.S.C. §§ 1311(a) and 1362(12).

80.     None of the above-referenced discharges of oil from Line 6B pipeline was authorized by a permit issued by U.S. EPA or the State of Michigan pursuant to Section 402 of the CWA, 33 U.S.C. § 1342. None of the above-referenced discharges of oil from Line 6A pipeline was authorized by a permit issued by U.S. EPA or the State of Illinois pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.

81.     Each of the discharges of oil from Line 6B pipeline into Talmadge Creek, the Kalamazoo River, Morrow Lake or adjacent wetlands violated Section 301(a) of the CWA, 33 U.S.C. § 1311(a).  Each of the discharges of oil from Line 6A into the unnamed tributary of the

Des Plaines River or the retention pond referred to in Paragraph 35 above, violated Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

82.     Pursuant to Section 309(b) of the CWA, 33 U.S.C. § 1319(b), Defendants are subject to injunctive relief.

### Claim No. 3: Removal Costs
### Under Sections 1002 and 1017 of OPA

83.     Paragraphs 1 through 82 are re-alleged and incorporated herein by reference.

84.     As a result of the above-described discharges of oil from the ruptured Line 6B on July 25 and 26, 2010, the United States has incurred and paid removal costs within the meaning of Section 1001(31) of OPA, 33 U.S.C. § 2701(31).  The United States will continue to incur additional removal costs into the future as a result of those discharges.

85.     Enbridge reimbursed removal costs that the United States incurred in response to the Line 6B discharges to the extent that such costs were paid by the United States and charged against the Oil Spill Liability Trust Fund on or before October 1, 2015.  Since October 1, 2015, the United States has incurred, paid, and charged against the Oil Spill Liability Trust Fund at least $5,438,222.00 in additional removal costs relating to the Line 6B discharges.  Enbridge has not reimbursed the additional removal costs that the United States incurred, paid or charged against the Oil Spill Liability Trust Fund after October 1, 2015.

86.     As owners and operators of Line 6B, Defendants are jointly and severally liable for paying all unreimbursed removal costs incurred by the Spill Fund as a result of the discharges of oil from Line 6B, without regard to any limitations on liability.

87.     Pursuant to Section 1017(f)(2) of OPA, 33 U.S.C. § 2717(f)(2), and the Declaratory Judgment Act, 28 U.S.C. § 2201, the United States is entitled to a declaratory

judgment on the liability of Defendants for removal costs that will be binding in any subsequent action or actions to recover removal costs.

## **REQUEST FOR RELIEF**

WHEREFORE, the United States of America respectfully requests that this Court:

A.      Enter judgment against each Defendant and award the United States civil penalties in an amount up to $4,300 per barrel discharged, pursuant to Section 311 of the CWA, 33 U.S.C. § 1321;

B.      Issue an order pursuant to Section 309(b) of the CWA, 33 U.S.C. § 1319(b), requiring Defendants to take all appropriate actions to prevent future discharges of oil to waters of the United States from facilities owned or operated by Defendants within the United States;

C.      Award judgment against Defendants for $5,438,222.00 in removal costs incurred, paid or charged against the Fund paid through October 1, 2015, as a result of the Line 6B discharges;

D.      Enter a declaratory judgment pursuant to Section 1017(f)(2) of OPA, 33 U.S.C. § 2717(f)(2), finding Defendants strictly liable for all removal costs that the United States hereafter pays in connection with the Line 6B discharges, without regard to any monetary limitations; and

E.      Grant the United States such other relief as the Court deems just and proper.

Respectfully submitted,

FOR THE UNITED STATES:


  s/ John C. Cruden
JOHN C. CRUDEN
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice


  s/ Steven J. Willey
STEVEN J. WILLEY (Ohio 0025361)
JOSEPH W.C. WARREN
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C.  20530
(202) 514-2807
steven.willey@usdoj.gov
(202) 616-6584
joseph.warrem@usdoj.gov


PATRICK A. MILES, JR.
United States Attorney
Western District of Michigan


  s/ Ryan Cobb
RYAN COBB
Assistant U.S. Attorney
330 Ionia Avenue, N.W.
Suite 501
Grand Rapids, MI  49503
(616) 456-2404
ryan.cobb@usdoj.gov

OF COUNSEL

KAREN L. PEACEMAN
LESLIE A. KIRBY-MILES
Associate Regional Counsel
U.S. Environmental Protection
    Agency-Region 5
77 West Jackson Blvd.
Chicago, IL 60604-3507
(312) 353-5751
peaceman.karen@epa.gov
(312) 353-9443
kirby-miles.leslie@epa.gov


CHERYL T. ROSE
Senior Attorney
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W. (MC-2243A)
Washington, D.C. 20460
(202) 564-4136
rose.cheryl@epa.gov